CLERKS OFFICE US DISTRICT COURT
AT ABINGDON, VA
FILED

October 08, 2024

LAURA A. AUSTIN, CLERK
BY: /s/ Kendra Campbell
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA

| | | |
|---|---|---|
| **MONICA ANDREWS,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2:22CV00028 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **LOUIS DeJOY, Postmaster General, U.S. Postal Service,** | ) | JUDGE JAMES P. JONES |
| | ) | |
| Defendant. | ) | |

*Argued: A. Marques Pitre, PITRE & ASSOCIATES, LLC, Washington, D.C., for Plaintiff; Nicole A. Gross, Special Assistant United States Attorney, Knoxville, Tennessee, for Defendant.*

The plaintiff, an employee of the United States Postal Service (USPS), claims that her immediate supervisor discriminated against her and created a hostile work environment in reprisal for filing administrative complaints against him. She also alleges that he created a hostile work environment based on her race. Among other things, the plaintiff claims that he was responsible for suspending her on several occasions and eventually terminating her employment, although pursuant to a union contract arbitration, she was reinstated and paid her lost wages. The defendant Postmaster General has filed a Motion for Summary Judgment, contending that the plaintiff cannot sustain her burdens of proof, namely that she cannot show that her job performance was satisfactory or that similarly situated employees of a different race were treated more favorably. The defendant also asserts that she cannot

establish that her termination was motivated by her complaints against her supervisor.

Based on my consideration of the record and the parties' submissions, and for the following reasons, I must grant the Motion for Summary Judgment and enter final judgment in favor of the defendant.

## I. FACTS.

Plaintiff Monica Andrews began working for the USPS in 2017 in a postmaster relief role in Harlan County, Kentucky, before becoming a postal service employee clerk in East Stone Gap, Virginia, in 2018.   In November 2019, she transferred to the small Norton, Virginia, post office as a part-time flexible Sales and Services/Distribution (SSD) clerk.   As part of her part-time status, Andrews's schedule was subject to change.   Andrews was still working at the Norton post office in the same role as of May 2024.

The plaintiff alleges that her immediate supervisor at the Norton branch, Postmaster Dennis Ley, created a hostile working environment on the basis of race and reprisal, and that he discriminated against her on the basis of reprisal.[1]   Andrews

---

[1] Andrews has withdrawn her claim for employment discrimination on the basis of race.  Pl.'s Opp'n. Def.'s Mot. Summ. J. 3 n.1, ECF No. 52.

is a Black female and Ley is a white male.  Two other clerks under Ley's supervision performed similar duties to the plaintiff and both of them are white females.

Ley has worked for the USPS since 2018.  In January 2020, he became Postmaster of the Norton branch.  Andrews's and Ley's time at the Norton post office overlapped from January to June 2020.  As Andrews would later write in a July 2020 submission for an Equal Employment Opportunity (EEO) complaint, Ley displayed "super aggressive," "combative," and "intimidating" behavior toward her "from the beginning."  Def.'s Reply Supp. Mot. Summ. J. Ex. 1, EEO Submission 2, ECF No. 53-1.  Other employees of the Norton branch reported similar concerns about Ley's behavior towards them in a survey conducted in February 2020, the month after Ley joined the branch.

Ley took issue with Andrews's conduct at work almost immediately.  In early February, he had discussions with Andrews regarding what he felt was her improper use of a cell phone at work, unsatisfactory performance of her window and sales functions, and other improper conduct.  He also went on to issue Andrews a seven-day suspension for her tardiness on multiple days that month.

Andrews contends that her tardiness was due in part to last minute changes that Ley made to her schedule, and he did not make similar changes to the schedules of her white coworkers.  For example, on February 15, 2020, Andrews did not appear for work until over an hour after her scheduled start time.  Andrews argued in her

opposition to the motion for summary judgment that Ley caused her to be late that day because he changed her start time from 9:30 AM to 6:30 AM at the last minute. Pl.'s Opp'n. Def.'s Mot. Summ. J. 6, ECF No. 52.  However, in her deposition, Andrews did not recall having ever arrived late.  Def.'s Mem. Supp. Mot. Summ. J. Ex. 1, Andrews Dep. 100, ECF No. 48-1.

Andrews argues that Ley discriminated against her in two other ways in early February of 2020.  First, she claims that on one occasion he wrote a checklist of her duties on a sticky note and attached it to her computer screen while not giving similar sticky notes to anyone else.  While the note did not have Andrews's name on it, the computer it was attached to was one that "mainly" Andrews used, although she was not the only clerk working that day.  *Id.* at 58–59.

Andrews also alleges that on the same day, Ley made a racially insensitive comment toward her.  She was wearing her hair in an afro, and Ley showed her a photo in a USPS handbook of a Black woman in a postal service uniform wearing her hair straight.  Andrews claims that Ley pointed to the woman and told Andrews to wear her hair the same way, saying something to the effect of, "[y]ou can't be wearing an afro."  *Id.* at 60, 120.  No one else was present when Ley made the comment, and Ley claimed in his deposition that he does not know what an afro is. Def.'s Mem. Supp. Mot. Summ. J. Ex. 4, Ley Dep. 48, ECF No. 48-4.  Andrews

reported Ley's comment to her union steward, although she did not recall the steward's response.

Beginning in mid-February, tensions between Ley and Andrews escalated. On February 19, Andrews used her USPS email account to write to Ley's supervisor, Thomas Buzzo, to report "workplace bullying by a supervisor." *Id.* at Ex. 13, Andrews Email 2/19/20 at 1, ECF No. 48-13. The following day, Buzzo spoke to her about the email, and then sent notes from that conversation to Shawn Godfrey, who worked with postal labor relations. According to Buzzo's notes, Andrews told him that Ley "created a hostile work environment between us," that she felt "bullied" and "harassed," and that Ley had conflicts with customers. *Id.* at 3. Buzzo told Godfrey in the same email that he did not tell Ley "anything about this complaint," and recommended that a "climate survey" of local postal employees be performed, which was carried out shortly thereafter. *Id.* at 2.

During the climate survey, multiple employees of the Norton post office expressed concerns about Ley's behavior.[2] One clerk, Katlan Hottinger, said that Ley "speaks extremely hateful to clerks [and] carriers," and that his "arrogants [sic] is intolerable and has employees on constant edge." Def.'s Mem. Supp. Mot. Summ.

---

[2] While the submitted statements of employees taken during the climate survey are unsigned and unsworn, no objection has been made to their consideration by the court and they likely would be admissible at trial over any hearsay objection. Fed. R. Evid. 803(7), (8).

J. Ex. 3, Climate Survey 2, ECF No. 48-3.  A city carrier, Angie Dickenson, reported that Ley "likes to nit pic [sic]" and "has to [sic] high expectations on the clerks."  *Id.* at 3.  A rural carrier, Ray Cekalla, said that Ley "is disrespectful to people."  *Id.* at 4.  One clerk also stated that Ley made Andrews cry during one interaction.

From 2019 to 2020, Milton Harris worked as a contracted janitor at the branch and his time there overlapped with Ley's and Andrews's.  Harris is a Black man, and while Ley had to report to Harris's employer about his performance, he was not his supervisor.  Therefore, Andrews was the only Black employee Ley directly supervised.

Harris did not participate in the climate survey, but Andrews entered a document into the record titled "Sworn Declaration of Milton Harris."  Pl.'s Opp'n. Def.'s Mot. Summ. J. Ex. 2, Harris Decl., ECF No. 52-2.  In his declaration, Harris wrote that he had witnessed Ley "harassing and yelling at Ms. Andrews," "standing in close proximity to her, and telling her to be off the clock by a certain time," and telling Andrews that her uniform was not in compliance even though Harris thought she was dressed identically to the other two clerks.  *Id.*

On February 21, Ley and Andrews had an interaction that resulted in Ley calling the police to the Norton post office.  They make differing claims about why the police were called.  According to Ley, he saw her stacking parcels unsafely on a table so that she was creating a stack that was higher than her head.  When he

inquired about it, she "became loud and disrespectful," began recording Ley on her phone and would not stop, and then would not leave the post office after Ley ordered her to clock out and do so.   Def.'s Mem. Supp. Mot. Summ. J. Ex. 16, Dist. Discipline Req. 2, ECF No. 48-16.   Ley told her she was being put onto emergency placement — a form of off-duty status without pay that continues until further notice — and called the police.   Andrews stayed at the post office until the police arrived, and they escorted her out of the branch.   *Id.*

According to Andrews, Ley called the police simply because, after he asked to give her a pre-disciplinary interview, she asked for a union steward to be present during the interview.   Andrews Dep. 66, ECF No. 48-1.   He did not contact a steward and asked her to leave.   Where Ley's and Andrews's stories converge is that they agree Andrews did not leave the post office when Ley told her to do so.   *Id.*

According to the resulting police report, Ley told the responding officers that he had "just fired Monica Andrews" and that she refused to leave or return her keys.   Pl.'s Opp'n. Def.'s Mot. Summ. J. Ex. 5, NPD Incident Rep. 1, ECF No. 52-5.   It also mentions that Andrews came to the police station the following day, on February 22, and spoke with a responding officer.   She told him that Ley had been harassing her at work, describing him as getting angry and kicking doors.

Also on February 22, Andrews filed an informal complaint related to the incident from the prior day with the EEO office.   She alleged discrimination based

on race because Ley called the police to have her escorted from the building. Andrews also alleged a hostile work environment because Ley had previously yelled at her and changed her schedule without notice so that she would be late for work, then disciplined her for lateness. She also alleged that Ley did not provide her a union steward when she was given a pre-disciplinary interview.

On February 25, Andrews was issued a seven-day suspension. While this occurred soon after the police incident, the suspension stemmed from Andrews's attendance issues during the month of February. The effective suspension date would have been March 14 to 21, 2020, although Andrews did not recall in her deposition whether she served the suspension. Andrews Dep. 69, ECF No. 48-1.

On March 2, Andrews had a pre-disciplinary interview with Postmaster Don White and her union representative Greg Perkins regarding the February 21 police incident. This resulted in White issuing another seven-day suspension to her for failure to follow instructions and insubordination. Buzzo, Ley's supervisor, concurred with the suspension.

On March 18, Ley was notified via email that Andrews had filed the informal EEO claim against him. Def.'s Mem. Supp. Mot. Summ. J. Ex. 19, Gordon Email 3/18/20 at 1, ECF No. 48-19. Andrews's return to work from her emergency placement and suspension came four days later, on March 22. Then, on March 24, Ley began taking notes on his interactions with Andrews. Def.'s Mem. Supp. Mot.

-8-

Summ. J. Ex. 20, Ley Notebook 2, ECF No. 48-20.  He did not take notes on any other employees because, he said, he was not having performance issues with any of the others.  Ley Dep. 27, ECF No. 48-4.  While Ley stated during his deposition that he was not aware of the EEO claim Andrews had filed when he began taking the notes, he replied to the March 18 email a few hours after it was sent to tell the EEO specialist to let him know if any additional information was needed.  *Id.* at 26; Gordon Email 3/18/20 at 1, ECF No. 48-19.

On March 27, Ley requested that Buzzo revoke Andrews's email access because, according to the notes he took on the interaction, email was not required for her position and because of "foreseen issues."  Ley Notebook 5, ECF No. 48-20. In his deposition, Ley explained that these "foreseen issues" included "sending emails to people that she does not have the authority to . . . send to, as a representative of the postal service," and Andrews's emailing of Buzzo on one occasion to tell him that the police were in the post office at a time that they were not.  Ley Dep. 37, ECF No. 48-4.  He said that her duties did not require email access.

It was with her USPS email account that Andrews reported Ley for workplace bullying to his supervisor, Buzzo, in February.  However, according to Ley, Andrews could have used other tools of communication to make similar reports. Andrews stated during her deposition that while she needed email access for postmasters to communicate with her about "things" she needed to know to perform

her job, email was not the only way she was notified of those things.  Andrews Dep.

40, ECF No. 48-1.  Andrews also agreed that none of her daily tasks required her to

email anyone within the post office.

On April 1, he wrote more notes on his interactions with her and her

A few days after Ley revoked Andrews's email access, on March 31, he spoke

with her about what he felt was her unsatisfactory distribution of packages.  On the

next day, April 1, he wrote more notes on his interactions with her and her

unfamiliarity with products available to customers, her lack of motivation to upsell

products, and her inability to find an item Ley asked for in the basement.  He

continued to describe his interactions with her over the following days.

On April 3, Andrews filed her first formal complaint with the EEO office.

Pl.'s Opp'n. Def.'s Mot. Summ. J. Ex. 9, Final Agency Decision 6/7/22, ECF No.

52-9.  In her complaint, she alleged that Ley discriminated against her on the basis

of race.  Her claims arose almost entirely from interactions with Ley that occurred

in February.  Among them, she alleged that she was required to work while off the

clock between February 3 and 19 on eleven days; had her work schedule changed

without notice on February 15; was given an investigative interview on February 20;

and was placed on emergency placement on February 21.  The complaint was closed

two years later in a Final Agency Decision (FAD) on June 7, 2022, with a finding of no discrimination.

Throughout the month of April, Ley continued to record his notes on his interactions with Andrews.  They focused on Andrews's handling of distribution, her failure to follow instructions on clocking out, her noncompliance with USPS uniform requirements, and general conduct and insubordination issues.

In response to Ley's concerns with her failure to carry out her distribution tasks, Andrews contends that she never received or was offered training on distribution.  Andrews stated that she requested training from Ley, who did not respond to the request.  Andrews Dep. 121, ECF No. 48-1.  She agreed that distributing the mail was a task required as part of her job.  But she also stated that she was never offered on-the-job, paid training with a nearby trainer whom the Norton post office used.  And her co-clerks, who were both white, received training to case the mail but she did not, although she could not recall when they would have received that training.

One of her co-clerks, Hottinger, stated in an email sent to Andrews in February 2020 that, "[Andrews] has always showed [sic] initiative and willingness to learn her duties, however, has not been given sufficient training or time to learn them."  Pl.'s Opp'n. Def.'s Mot. Summ. J. Ex. 3, Hottinger Email 1, ECF No. 52-3.  Ley contended, however, that Andrews received "some degree of training" on a

weekly basis, and "had continuous training and guidance" from her co-clerks.  Ley Dep. 50, ECF No. 48-4.

Relatedly, Andrews described her role as an SSD clerk at the Norton branch as having "the same job description" as her prior roles in other post office branches. Andrews Dep. 31, ECF No. 48-1.  And for her prior postmaster relief role, part of the job description was, in her words, to "assist the public with mailing packages, letters, distributing mail." *Id.* at 18.  But her postmaster relief position was at the branch in Harlan, Kentucky, where the distribution operations may have differed from those at Norton.

Ley's concerns with Andrews's performance continued through May and into June.  He issued her a fourteen-day suspension on May 21 because Andrews forgot her keys necessary for window service and needed to return home to get them; failed to scan express mail upon its arrival so that the guaranteed delivery times were not met; failed to make necessary moves on the time clock when changing operations; and did not clock out until ten minutes after her instructed clock-out time.

The suspension was to run from June 6 until June 19.  However, on June 11, Ley conducted another pre-disciplinary interview with Andrews.  It covered a range of issues, including uniform noncompliance and Andrews's failure to scan and distribute mail on June 3 and June 8 despite retail service talks she received from Ley about the proper process for scanning packing supplies in February and April

-12-

2020.  They also discussed an incident in which Andrews did not report to work as instructed because she said she did not receive a text from Ley the night before the shift instructing her to do so.

The issues in that pre-disciplinary interview form the basis of the Notice of Removal — a notice that she was being terminated — that Ley issued to Andrews on June 22.  Def.'s Mem. Supp. Mot. Summ. J. Ex. 25, Notice of Removal 6/22/20 at 1, ECF No. 48-25.  Buzzo reviewed and concurred with the Notice of Removal.

Following her termination from the USPS, Andrews filed a second formal EEO complaint on October 20, 2020.  She alleged discrimination on the basis of race, sex, and age and retaliation due to her prior EEO activity.  Her allegations stem from the fourteen-day suspension given to her on May 21, the accusations of poor work performance on May 26, a reprimand for tardiness on June 8, and the Notice of Removal that was issued on June 22. The October 20 complaint was closed with a finding of no discrimination on June 8, 2022.

Andrews is a member of the American Postal Workers Union (APWU).  Pl.'s Opp'n. Def.'s Mot. Summ. J. at Ex. 4, Regular Arb. Panel 2, ECF No. 52-4.  Following a grievance she filed, APWU challenged her removal from the USPS and a hearing was held on the matter on March 24, 2022.  *Id.*  The arbitrator decided that her removal was not supported by just cause and mitigated it to a seven-day

suspension.  Andrews was reinstated, and she was provided backpay of $49,669.49.

Andrews Dep. 103, ECF No. 48-1.

Andrews brought suit on September 9, 2022.  While her two FADs were issued on June 7 and 8, 2022, I found that the 90-day time limit given to Andrews to file suit began on the day of her receipt of the decisions.  *Andrews v. DeJoy*, No. 2:22CV00028, 2023 WL 3600814 (W.D. Va. May 23, 2023).  I found she received the two FADs on June 10 and June 11, respectively.  While Andrews failed to timely file suit following the first FAD, her suit was timely in relation to the second FAD.  I left open the question of whether the continuing violation doctrine allows Andrews to overcome any objection to time-barred discrete acts alleged in the first FAD.  *Id.* at *2.

## II.  STANDARD OF REVIEW.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When ruling on a motion for summary judgment, the court must view "all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party."  *Tekmen v. Reliance Standard Life Ins. Co.*, 55 F.4th 951, 958 (4th Cir. 2022).

A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* (citations omitted). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48.

III.  DISCUSSION.

A. Hostile Work Environment.

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1).  "Since an employee's work environment is a term or condition of employment, Title VII creates a hostile working environment cause of action." *EEOC v. R&R Ventures*, 244 F.3d 334, 338 (4th Cir. 2001).  Andrews alleges that she was subjected to a hostile work environment on the basis of her race and in retaliation for her prior EEO activity.

To survive summary judgment on her hostile work environment claim, Andrews must show "(1) unwelcome conduct; (2) that is based on [her] [protected

status]; (3) which is sufficiently severe or pervasive to alter her conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." *Strothers v. City of Laurel,* 895 F.3d 317, 328 (4th Cir. 2018) (citation omitted).

"[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances," which "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). "[N]o single factor is required," *id.*, but Title VII is not a "general civility code." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)). Conduct amounting to a hostile work environment must be "extreme to amount to a change in the terms and conditions of employment." *Id.* "'[S]imple teasing,' (quoting *Oncale*, 523 U.S. at 82), offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Id.*

Andrews does not satisfy the second and third elements of a hostile work environment. While the record shows that Ley subjected Andrews — and the other clerks and carriers at the Norton post office — to harassing and otherwise unwelcome conduct, it does not show that Ley behaved that way because of

Andrews's race or her filing of EEO complaints.  And the record does not establish that Ley's treatment was "sufficiently severe or pervasive to alter her conditions of employment and to create an abusive work environment."  *Strothers*, 895 F.3d at 328.

First, Andrews does not sufficiently connect Ley's behavior to either her race or her EEO activity.  During the relevant times, Andrews was the only Black clerk working at the Norton post office.  But the record shows that Ley directed his aggressive behavior towards white employees, as well.[3]  Andrews herself wrote in an EEO submission that in early February, Ley made the lead clerk, Hottinger, leave work in tears.  EEO Submission 2, ECF No. 53-1.  And the climate survey featured unanimous criticism by the other interviewed employees, all of whom are white, toward Ley's demeanor.  Lastly, Ley continued disciplining other employees, who were white, after he had terminated Andrews's employment.

Though she accuses Ley of making only one racially insensitive comment, Andrews argues that a court may infer harassment was racially charged or based on

---

[3]  In Milton Harris's sworn declaration, he wrote that "it is my personal belief that Mr. Ley didn't care too much for black people."  Harris Decl. 1, ECF No. 52-2.  But that conclusory statement does not distinguish Ley's alleged behavior towards Harris and Andrews from the way he treated the white employees at the Norton post office.  On a motion for summary judgment, the nonmoving party's evidence cannot be "conclusory statements … without specific evidentiary support," like Harris's.  *L. Enf't All. of Am., Inc. v. USA Direct, Inc.*, 56 F. App'x 147, 148 (4th Cir. 2003) (unpublished) (quoting *Causey v. Balog*, 162 F.3d 795, 802 (4th Cir. 1998)).

retaliation when the plaintiff was targeted more frequently than coworkers of a different race or who did not engage in protected activity. *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 317–18 (4th Cir. 2008) (finding that "a reasonable jury could infer that other harassing incidents were also motivated by a disdain for" the employee's protected status when he suffered harassment more frequently than others did and more likely because of his protected status). Under this theory, Ley's alleged comment about Andrews wearing her hair in an afro could be used to infer that his other criticisms and discipline of her was racially charged. Similarly, it could be inferred that because he continued to be critical of her performance after he learned of her EEO activity, his continued behavior was based on retaliation.

But the record does not show that Ley was more unpleasant, or more frequently unpleasant, toward Andrews than he was toward the other employees. In fact, it shows that Ley continued disciplining employees after Andrews's employment was terminated, giving a suspension and a termination to two white employees. Def.'s Mem. Supp. Mot. Summ. J. Ex. 5, Notice of Termination, ECF No. 48-5. He also issued a white employee a warning letter for tardiness and attendance issues and counseled another on uniform noncompliance. Def.'s Mem. Supp. Mot. Summ. J. Ex. 6, Def.'s Answers Pl.'s Interrog. 12, ECF No. 48-6. And the climate survey shows that other employees were uniformly unhappy with his leadership. Lastly, Andrews herself stated in her EEO submission that Ley once

brought her co-clerk, Hottinger, to tears.  The record therefore does not support that Ley targeted Andrews more frequently or more intensely than any other employee.

Andrews likewise does not connect Ley's behavior to retaliation for her EEO activity because, as she admitted in her EEO submission, Ley's "super aggressive" and "combative" behavior towards her "did not gradually become this way."  EEO Submission 2, ECF No. 53-1.  "[H]e started out with this demeanor from the beginning."  *Id.*  If Ley had the same behavior before and after Andrews began her EEO activity, then his behavior must have had another cause besides retaliation. Since the record also does not establish that Ley's actions were based on Andrews's race, Andrews does not meet the second element of her hostile work environment claim.

Second, even if Andrews had connected his behavior to her race or EEO activity, she does not meet the third element that Ley's unwelcome conduct was severe or pervasive enough to constitute a hostile work environment.  The following examples that Andrews uses to support her claim may indicate a tedious, unwelcome, or frustrating environment, but none could be said to have "interfere[d]" with her work performance, constitute physical threats or humiliation, or were in any way "severe."  *Harris*, 510 U.S. at 22–23.

One incident that Andrews uses to support her claim is Ley's changing of her schedule at the last minute on February 15.[4]  She alleges that after she left work on February 14, he changed her start time for the following day from 9:30 AM to 6:30 AM without notifying her.  But, assuming Ley did so, it could not support a claim for a hostile work environment on the basis of race or reprisal because Andrews was not the only clerk to whom Ley did this.  Andrews's white co-clerk, Hottinger, stated in the climate survey that Ley "changes schedule without notifying employees."  Climate Survey 2, ECF No. 48-3.  Furthermore, while possibly annoying, changing the schedule without notice and at the last minute of a clerk who was admittedly not working set hours at the time, Andrews Dep. 26–27, ECF No. 48-1, does not create a "severe" or hostile environment.

Andrews also contends that Ley writing a short list of her duties on a sticky note and attaching it to a computer she usually used at the post office contributed to the hostile work environment because her white co-clerks did not receive similar sticky notes.  But the checklist contained only three tasks: "distribution (Amazon &

---

[4]  Andrews's assertions about the incidents that support her two remaining claims differ slightly between her Complaint and her Opposition to the Motion for Summary Judgment.  I will consider the specifics that she puts forth in her Opposition, rather than her Complaint, because on a motion for summary judgment the non-moving party must "go beyond the pleadings" to show there are "specific facts showing that there is a genuine issue for trial."  *Bandy v. City of Salem,* 59 F.4th 705, 709–10 (4th Cir. 2023) (quoting *Celotex Corp. v. Catrett ex rel. Catrett*, 477 U.S. 317, 324 (1986)).

UPS)," "restock priority packaging in lobby," and "clean/sanitize lobby & work area."  Def.'s Mem. Supp. Mot. Summ. J. Ex. 27, Sticky Note 1, ECF No. 48-27.

Andrews does not allege that the tasks on the sticky note fell outside her duties or were additional work for her to complete; her position at her deposition was that Ley subjected her to a hostile work environment because there were fewer tasks on the sticky note than on a different checklist Andrews had previously been following. But there is no evidence in the record supporting her deposition claim that Ley would later discipline her for not doing tasks that were not listed on the sticky note.  While the sticky note did not have her name on it, assuming that Ley put it on the computer and intended for it to replace whatever checklist Andrews had been using prior, still does not support the existence of a hostile work environment.  Providing a checklist of duties to complete does not "unreasonably interfere[] with an employee's work performance," rather, the checklist should have helped Andrews do her job.  *Harris*, 510 U.S. at 23.

While Andrews withdrew her claim of discrimination on the basis of race, she maintains that Ley once told her something to the effect of, "[y]ou can't be wearing an afro."  Andrews Dep. 120, ECF 48-1.  She argues this supports her claim of a racially hostile work environment.  While no one else witnessed the comment, which Ley implicitly denied in his deposition, assuming its truth does not provide enough support for Andrews's hostile work environment claim.  This is the only comment

Andrews alleges Ley made that references race, but an isolated incident is not enough. *Faragher*, 524 U.S. at 788; *see also Harris*, 510 U.S. at 23 (explaining that the "frequency of the discriminatory conduct" may be considered in determining a hostile work environment).

Andrews contends that Ley created a hostile work environment by requesting that her email access be revoked when he did not do so for her co-clerks. But Andrews did not need email access to do her job, and she stated in her deposition that none of her daily tasks required her to email anyone in the post office. There were other ways for her to communicate with postmasters at the Norton office besides email. Indeed, Ley had Andrews's phone number and would text her to inform her of schedule changes. And one of the clerks who retained her email access sometimes performed the job duties of the postmaster when he was absent. The postmaster's duties do necessitate email use. The other clerk was assigned to a different post office and would work in Norton if a clerk was needed, but as a result, for administrative reasons, Ley was not authorized to take any actions related to her email account. Ley Dep. 21, 31, ECF No. 48-4. Therefore, the record does not show that Andrews's lack of email interfered with her duties or was otherwise negative.

Andrews alleges that Ley did not acknowledge a leave request form of hers and that this contributed to the hostile work environment. Pl.'s Opp'n. Def.'s Mot. Summ. J. 4, ECF No. 52. Her deposition, however, muddles the claim. She stated

that she submitted two leave request forms to Ley during their overlapping time at the Norton post office.  Andrews submitted her first leave request before Ley became Postmaster of the Norton post office.  Ley apparently received the form, although Andrews did not explain how that happened if Ley had not yet joined the Norton post office.  Regardless, Andrews stated that after she submitted the form, Ley "had the option of denying it or approving it, and he didn't deny it."  Andrews Dep. 78, ECF No. 48-1.  She characterized this as the request being "approved" by Ley.  *Id.* at 77.   Regarding an April 6 leave request form, however, Andrews stated that Ley "looked at it, and he did not approve or disapprove it, so that would be a disapproval."  *Id.* at 76.  It is not clear why, the first time Ley did not apparently approve or deny the request, Andrews interpreted that as an approval, but the second time he did not approve or deny it, she interpreted it as a denial.  She claimed in the deposition that she knew he did not deny anyone else's leave request, but there is no other evidence in the record supporting that claim.

Andrews argues Ley "made" her work off the clock and that this contributed to a hostile work environment.  Pl.'s Opp'n. Def.'s Mot. Summ. J. 4, ECF No. 52.  Her deposition, again, contradicts this claim:

> Q: So [Ley] specifically told you to clock out, but you still had work to finish?
> A: Correct.
> Q: What was the reason he was asking you to clock out?
> A: He wanted me to leave.
> . . . .
> Q: Okay. He asked you to clock off, and you continued to work?

A:  Yes.
Q:  But he did not specifically ask you to continue working?
A:  No.

Andrews Dep. 51–52, ECF No. 48-1.  Because Andrews herself contradicted her

allegation that Ley "made" her work off the clock by stating that he wanted her to

leave and did not tell her to continue working, the allegation cannot support a hostile

work environment claim.

Andrews also argues that Ley "improperly" placed her on emergency

placement following the police incident on February 21.  Pl.'s Opp'n. Def.'s Mot.

Summ. J. 4, ECF No. 52.  Although the sequence of events is disputed, Andrews

admitted in her deposition that she did not leave the post office when Ley instructed

her to do so.  Andrews Dep. 66, ECF No. 48-1.  The emergency placement was

issued to her because she "blatantly and repetitively refused to follow multiple direct

orders."  Def.'s Mem. Supp. Mot. Summ. J. Ex. 17, Emergency Placement Notice 1,

ECF No. 48-17.  The record therefore does not support a claim that Ley improperly

placed her on emergency placement because Andrews admitted to the conduct that

was the basis of Ley's decision.

Andrews also alleges that in February 2020, Ley yelled, kicked doors, and

invaded her space, among other aggressive behavior.  Pl.'s Opp'n. Def.'s Mot.

Summ. J. Ex. 1, Andrews Notes 1, ECF No. 52-1.  She wrote in her notes that

"[t]here is no one to witness this."  *Id.*  Assuming the truth of the allegation, she does

not cite to any evidence that this behavior continued after March 18, when Ley learned of her EEO activity. Even if it did, the fact that it began before then does not support a claim that it was done in retaliation. And the climate survey reflects that other Norton employees found Ley to be "confrontational," "extremely hateful to clerks [and] carriers," and had "employees on constant edge." Climate Survey 3, 2, ECF No. 48-3. Andrews does not provide evidence that distinguishes Ley's aggressive behavior towards her from that which he directed towards the other employees of the post office. Therefore, she does not support her claim that he subjected her to a hostile work environment on the basis of her race.

The defendant contends that Andrews received training from a certified postal trainer, refresher training from her co-clerks, and training from a different postmaster to help her carry out her required mail distribution tasks, but that Andrews still "failed to grasp the scheme of distribution." Def.'s Mem. Supp. Mot. Summ. J. 16, ECF No. 48. Her failure to carry out distribution duties is cited in her Notice of Removal and was an issue throughout her tenure at the Norton post office.

Andrews disputes the defendant's contention, arguing instead that she did not receive any distribution training and was refused training when she asked for it. She further claims that Ley "wrongfully" accused her on May 26 of poor work performance for not carrying out her mail distribution duties because she was denied training for those tasks. Pl.'s Opp'n. Def.'s Mot. Summ. J. 5, ECF No. 52. To

support this claim, she cites only to her Complaint and deposition.  Complaint 5,

ECF No. 1; Andrews Dep. 83, ECF No. 48-1.  However, she submitted as part of the

summary judgment record the Final Agency Decision on her October 2020 EEO

complaint, which does discuss the May 26 interaction.

According to the FAD, Ley, Andrews, and Hottinger were performing the

morning distribution on May 26 when Ley told Andrews to switch her assignment

of sorting letter mail with Hottinger, who was distributing packages.  Pl.'s Opp'n.

Def.'s Mot. Summ. J. Ex. 8, Final Agency Decision 6/8/22 at 6–17, ECF No. 52-8.

Ley said that he did this because Andrews was sorting the letters at a rate of three

per minute versus the forty-five letters per minute that was the normal average for a

clerk.  The FAD found that "[t]he record shows that the complainant was, in fact,

slow at letter-mail distribution" and that Andrews "cannot credibly claim that she

was insulted by being moved off a task for which she claimed at arbitration that she

was untrained and, therefore, immune from corrective action for poorly performing

it."  *Id.* at 17.  The FAD went on to decide that Andrews could not prove she was

subjected to a hostile work environment and made a finding of no discrimination on

all of her claims.

I will not rely on the FAD's factual findings because I do not know on what

evidence they were based.  But it is striking that, beyond her allegation itself, the

only piece of evidence that Andrews filed into the record to oppose the Motion for

Summary Judgment that corroborates her claim that Ley spoke to her on May 26 about her distribution is one that also found her objection to it baseless.

To the extent that Andrews's argument is that Ley created a hostile work environment by wrongly disciplining her for not distributing mail after refusing her requested training at some point in the weeks leading up to her removal, the record before me does not support that claim, either.

As a preliminary matter, Andrews admitted in her deposition that she did not distribute the mail as her job required.  Andrews Dep. 122, ECF No. 48-1.  She reiterated that this nonperformance was because she was not trained to do so.  But Andrews's previous USPS position involved, in her own words, "distributing mail." *Id.* at 18.  And even if the operations at her previous position and at the Norton post office entailed different distribution procedures, Andrews worked there for about half a year before her removal.  In that time, she apparently never learned how to distribute the mail.  This is one of the required duties of a Sales and Services/Distribution clerk.

Andrews cites a February 2020 email that her co-clerk, Katlan Hottinger, sent to her.  In the email, Hottinger expressed her view that Andrews had not been "given sufficient training or time to learn" her duties.[5]  Hottinger Email 1, ECF No. 52-3.

---

[5]  Ley's notebook contains an entry from March 28, 2020, that reads, "Katlan [Hottinger] called after closing to provide input on Monica and what are they trained on [sic].  Katlan stated Monica has no motivation or desire to learn/progress."  Ley Notebook

She also cites the February climate survey, in which Ray Cekalla said that Andrews "has only been trained on the window, she don't know distribution." Climate Survey 4, ECF No. 48-3. Because of the email and climate survey, the evidence in the record can support a reasonable inference that Andrews did not have sufficient training to distribute the mail in February.

However, her contention is that Ley "wrongfully" accused her of poor work performance relating to her distribution duties about three months later, on May 26. Pl.'s Opp'n. Def.'s Mot. Summ. J. 5, ECF No. 52. The record does not contain evidence beyond her own deposition that Andrews actually asked for training and was denied it at any point. Nor does it support that Andrews continued to go without training in any of the weeks leading up to her removal. Instead, the record includes a form filled out as part of the June 11 pre-disciplinary interview that Ley conducted with Andrews. One of the questions asked why, on June 8, 2020, Andrews "left certified mail that was to be distributed to the carriers on the sorting table, even after Postmaster Ley reminded [her] to ensure they were distributed?" Def.'s Mem. Supp. Mot. Summ. J. Ex. 24, Pre-Disciplinary Interview 6/11/20 at 2, ECF No. 48-24. Andrews's response was recorded as, "you told me to wait to following day [sic]."

---

6, ECF No. 48-20. While no objection has been made to consideration of this entry, I will not consider it for the truth of Hottinger's apparent statement because it has not been shown that it would be admissible at trial as otherwise inadmissible hearsay. "Courts in the Fourth Circuit may not consider inadmissible evidence on a motion for summary judgment." *Giles v. Nat'l R.R. Passenger Corp.*, 59 F.4th 696, 704 (4th Cir. 2023).

*Id.* At that time, she apparently made no reference to a lack of training. In response to the follow-up questions relating to distributing and casing the mail, none of Andrews's answers suggest that she did not carry out her distribution duties because she asked for but was denied training on them. *Id.* at 2–3.

Of course, if Ley instructed Andrews to wait to perform a task until the next day only to use her non-performance of the task as a reason to conduct a pre-disciplinary interview, then that behavior supports the conclusion that Ley was a poor supervisor. The climate survey of the post office employees supports that conclusion, as well. Perhaps Ley violated a "general civility code" as postmaster, but Title VII is not such a code. *Faragher*, 524 U.S. at 788 (citation omitted).

Andrews's accusations are either unsupported or contradicted by the record, or they amount to an offhand comment or isolated incident. None of the allegations support concluding that Andrews was subjected to "extreme" conduct that was so "severe or pervasive" as to alter her conditions of employment. *Id.*; *Strothers*, 895 F.3d at 328. The record shows that Ley had a difficult personality, which he trained on the entire post office, and that Andrews failed to perform her job duties as instructed through June 2020. Because Andrews has not met her burden of proof for her hostile work environment claim, I must enter summary judgment for the defendant.

B.  Employment Discrimination on the Basis of Reprisal.

Title VII prohibits a federal employer from discriminating against an employee in retaliation for the employee's prior EEO activity.  42 U.S.C. § 2000e-3(a).  "Employees may prove that their employer retaliated against them for engaging in protected activity through one of two ways: (1) by direct evidence of retaliatory animus; or (2) through the . . . burden-shifting framework" of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Walton v. Harker*, 33 F.4th 165, 171 (4th Cir. 2022).  "Isolated remarks unrelated to the challenged employment decision are insufficient to provide direct evidence of discrimination."  *Finkle v. Howard Cnty.*, 640 F. App'x 245, 248 (4th Cir. 2016) (unpublished).

Andrews does not provide direct evidence of retaliatory animus.   Under *McDonnell Douglas*, she has the initial burden of establishing a prima facie case of retaliatory discrimination.   A prima facie case consists of proof that: "(1) she engaged in a protected activity, (2) the employer acted adversely against her, and (3) there was a causal connection between the protected activity and the asserted adverse action."  *Walton*, 33 F.4th at 177 (citation omitted).  Regarding the third element, "little is required" to establish a causal connection.  *Karpel v. Inova Health Sys. Servs.*, 134 F.3d 1222, 1229 (4th Cir. 1998).  But merely pointing to an adverse action occurring after the employee engaged in a protected activity to support the

connection can be rebutted by a "history of poor work performance." *Nnadozie v. Genesis HealthCare Corp.*, 730 F. App'x 151, 160 (4th Cir. 2018) (unpublished).

If Andrews makes a prima facie case, the burden will shift to the defendant to show that the adverse action was the result of a non-retaliatory reason. *King v. Rumsfeld*, 328 F.3d 145, 151 (4th Cir. 2003). Then the burden shifts back to Andrews to rebut the reason as pretext for retaliation. *Id.*

Andrews does not establish a prima facie case because she does not show a causal connection between her EEO reporting and her suspensions or her removal. While the record establishes that she engaged in protected EEO activity, that her suspensions and removal were adverse actions, and that some of the adverse actions occurred after her EEO activity, this sequence of events does not amount to the "little" that is required to show a causal connection between the two because of Andrews's "history of poor work performance." *Karpel*, 134 F.3d at 1229; *Nnadozie*, 730 F. App'x. at 160.

This history is shown by Andrews's disciplinary record at the Norton post office beginning almost a month before Ley learned that she communicated with the EEO office. Ley gave Andrews her first pre-disciplinary interview on February 20, requested she be put on emergency placement on February 21, and issued her first suspension on February 25. He did all of this before March 18, the day the record shows that he was made aware of Andrews's informal EEO complaint.

While Andrews did report Ley for workplace bullying on February 19 via an email to Buzzo and followed up on that report on February 20, Buzzo wrote to his supervisor on February 20 stating that he had not told Ley anything about the email complaint.[6] Therefore, she cannot use her emailed report to argue that Ley's period of retaliation began on February 20 instead of March 18. She also cannot argue that the alleged retaliation period began on February 22, when she initiated counseling with the EEO, because she again does not allege that Ley knew she did that. And Andrews complaining to Buzzo about the behavior Ley displayed before Ley learned about her EEO complaint itself undercuts her argument that Ley's behavior was an act of retaliation for her EEO complaint. Ley continuing to issue discipline to Andrews after he learned about her EEO activity does not establish a causal connection between the two.

But even if Andrews did establish a causal connection, the defendant has shown that the adverse actions were the result of non-retaliatory reasons. Andrews is not able to rebut these reasons as pretext.

Andrews contends that Ley requesting that her email access be revoked on March 27 is evidence of retaliation because she used her USPS email account to report Ley to Buzzo for workplace bullying in February. The defendant argues that

---

[6] Andrews does not allege that Buzzo's statement in that email about not telling Ley is incorrect or provide a date that Ley learned about the email, if he ever did.

the email revocation could not have been done in retaliation because, again, Ley never learned that she used her email to report him to Buzzo that day, and never learned the method of her EEO reporting.  There is no evidence in the record showing that Ley knew about her email to Buzzo or how she submitted her EEO complaints.  Instead, for the same reasons that his revocation of her email access does not support her claim that it contributed to a hostile work environment, it does not support her retaliation claim.

Andrews argues that Ley's accusation on May 26 of her poor work performance for distributing the mail incorrectly is evidence of retaliation in addition to a hostile work environment.  Again, for the same reasons that it does not support a hostile work environment claim on the basis of race and reprisal, the incident also does not support a retaliation claim.

Andrews also contends that Ley retaliated because he displayed "increased scrutiny" towards her in the form of criticizing her for not performing her distribution training and not following USPS uniform requirements.  Pl.'s Opp'n. Def.'s Mot. Summ. J. 13, ECF No. 52.  But the record does not show that Ley's scrutiny of Andrews "increased" after March 18, the day he learned about her EEO activity.  In Andrews's own words, Ley's "super aggressive" and "intimidating" behavior towards her and the other clerks "did not gradually become this way."  EEO

Submission 2, ECF No. 53-1.  Instead, "he started out with this demeanor from the beginning."  *Id.*

Andrews also claims that Ley retaliated against her by "wrongfully" accusing her on June 11 of not complying with the USPS uniform requirements.  Pl.'s Opp'n. Def.'s Mot. Summ. J. 13, ECF No. 52.  She cites the June 11 pre-disciplinary interview in which she was asked why she was not in full compliance with the uniform requirements on June 9.  Her answer is recorded as, "I was in full compliance w/ uniform policy."  Pre-Disciplinary Interview 6/11/20, ECF No. 48-24.  Even accepting that Andrews was in the proper uniform, Ley wrongly accusing her of violating the policy is not enough to sustain a retaliation claim.

Andrews does not provide evidence that Ley made the accusation to retaliate instead of, for example, because he simply did not understand the clerks' uniform requirements.  And the pre-disciplinary interview from June 11 reviewed other alleged violations of policy on Andrews's part beyond her uniform compliance.  It covered her receipt of service talks that communicated the proper process for scanning packing supplies, her failure to properly scan and distribute mail, and her tardiness on multiple days in June.  Therefore, the pre-disciplinary interview still would have happened — and the Notice of Removal could still cite to those violations — if her uniform had not have been in issue.  There is no evidence in the

record to support that Andrews would not have been subject to the same discipline that she argues was retaliation if Ley had never taken issue with her uniform.

Andrews argues that Ley taking notes on his interactions with her is evidence that all of the adverse actions were taken in retaliation. Because he began taking notes shortly after learning about her EEO complaint — six days — and did not take notes on any other employee, his notetaking is an example of how his "behavior towards [Andrews] changed" after her EEO complaint. Pl.'s Opp'n. Def.'s Mot. Summ. J. 12, ECF No. 52.

Ley replied to the email notifying him of the EEO complaint on March 18, although he stated in his deposition that he did not know about the complaint when he began taking notes on his interactions with Andrews. Whether Ley knew about the complaint before he took notes is not a material fact for the purpose of summary judgment because his taking notes on his interactions with Andrews is not evidence of retaliation.

Andrews's counsel argued during oral argument on the Motion for Summary Judgment that Ley's notetaking of his interactions with Andrews and no one else shows he was not trying to help Andrews improve her work performance but create a paper trail to justify removing her. But there is no direct evidence that supports this proposition. In fact, the notebook shows that Ley did take steps to help Andrews improve her work performance: On March 25, Ley wrote that he "went over

-35-

procedures for dist., box and window"; on April 6, he wrote that he instructed Andrews three times beforehand to clock out at 4:00 PM; on April 7, he wrote that he talked to her for the third time about the proper process for distributing mail; and on April 13, he wrote that he gave Andrews a name badge to wear, although she never put it on.  Ley Notebook 3, 11, 12, 14, ECF No. 48-20.

Even if Andrews had made a prima facie case of retaliation, she cannot show that the non-retaliatory reasons for her suspensions and removal are pretext.  The record shows that Andrews worked at the Norton post office for about half a year in 2020 and in that time refused direct orders from her supervisor Ley, apparently never learned how to complete her required distribution tasks, came to work tardy on multiple occasions, did not follow the uniform requirements to her supervisor's satisfaction,[7] and continued to have performance issues until her employment was terminated in June.  The record shows Andrews admitted to most of these issues in her deposition, EEO submission, and pre-disciplinary interview forms.  Andrews,

---

[7]  Harris wrote in his sworn declaration that he felt at one point Andrews was wearing an identical uniform to the other two co-clerks with whom Harris did not see Ley take issue with.  Harris Decl. 1, ECF No. 52-2.  Setting aside the fact that as a contracted janitor, Harris may not have been familiar with the required details of a clerk's uniform, the declaration does not provide a date for this interaction.  Harris seems to be describing only one incident, but the record shows Ley took issue with Andrews's uniform multiple times, and once counseled a different employee on his uniform violation.  Pre-Disciplinary Interview 6/11/20 at 1, 2, ECF No. 48-24; Def.'s Answers Pl.'s Interrog. 9, 10, 12, ECF No. 48-6.

therefore, does not show that the defendant pointing to these issues as the non-retaliatory reasons for her suspensions and removal is pretext.

Andrews argues instead that an independent arbitrator ultimately downgrading her removal to a suspension shows there are material facts in dispute over whether the adverse actions were justifiable.  As a preliminary matter, the arbitrator's decision covers only her removal, not the other suspensions that Ley issued to her.  Therefore, the decision could only show that the justification for the removal alone is in question.  But it does not.

Summary judgment is inappropriate when there is a genuine dispute as to material facts.  All reasonable inferences must be drawn in Andrews's favor.  But it is not reasonable to infer, from the arbitrator's decision that "just cause" supported "the imposition of severe disciplinary action" on Andrews, that Ley removed her from the USPS because he was retaliating against her for protected activity.  Regular Arb. Panel 1, 15, ECF No. 52-4.  Nor is it reasonable to infer, from the arbitrator's decision, that there is a genuine dispute as to whether Ley removed Andrews in retaliation.  This is because there is not sufficient evidence in the summary judgment record favoring Andrews's claims for a reasonable jury to return a verdict for her.  Rather, the record overwhelmingly shows that Andrews was removed for her seriously insufficient work performance.

Indeed, the notice of removal considered not just the tardiness, uniform, and distribution issues that Ley cited in May and June, but also Andrews's previous suspensions and two letters of warning issued to her, all regarding improper conduct. Notice of Removal 6/22/20 at 5, ECF No. 48-25.   Andrews claims that the arbitrator's downgrading of her removal based on an apparently different evidentiary record shows a genuine dispute.   But the arbitrator's decision does not show such a dispute, and she fails to show that the defendant's justifications for any of the adverse actions taken against her were pretext.

As a result, I must enter summary judgment for the defendant on Andrews's retaliation claim.

## IV.   CONTINUING VIOLATION DOCTRINE

While I left open the question of whether the continuing violation doctrine allows Andrews to overcome any objection to time-barred discrete acts, I will not address that question in this opinion because I will grant summary judgment for the defendant on all of Andrews's remaining claims.

## V.   CONCLUSION.

Monica Andrews claims that the USPS subjected her to a hostile work environment on the basis of race and reprisal and that it discriminated against her on the basis of retaliation.   The summary judgment record shows that her supervisor, Dennis Ley, was uniformly disliked at the Norton post office for his nitpicking,

anger, and otherwise difficult behavior.  It also shows that Andrews's work performance was seriously inadequate, and that the behavior of them both remained the same the entire time Ley's and Andrews's paths crossed at the Norton post office. Because Andrews has not put forth evidence on which a jury could return a verdict finding that Ley's behavior towards her was based on her race or the fact that she engaged in protected EEO activity, she has not made the requisite showings on either of her remaining claims.

For these reasons, the defendant's Motion for Summary Judgment, ECF No. 47, is GRANTED.  A final judgment will be entered for the defendant.

It is so **ORDERED**.

ENTER:  October 8, 2024

/s/  JAMES P. JONES
Senior United States District Judge